Motion to dismiss appeal submitted December 13, overruled December 31, 1918, argued on the merits November 25, 1919, affirmed January 20, 1920.

## ROHRBACHER *v.* STRAIN.*

(176 Pac. 990; 186 Pac. 583.)

**Appeal and Error—Notice—Description of Judgment.**

1. An appeal could not be sustained, notice being of appeal from decree of June 17th, the undertaking on appeal being indefinite as to date of decree, and there being nothing in the transcript to identify the decree mentioned in the notice with that shown in the transcript as rendered June 26th.

**Appeal and Error—Ineffectual Attempt—Second Appeal.**

2. An attempt to take an appeal, ineffectual because of misdescription of decree in notice of appeal, does not preclude taking of second appeal.

ON THE MERITS.

**Appeal and Error — Findings of Trial Court of Strong Advisory Weight in Equity.**

3. Since trial court has heard the witnesses orally, and has had a chance to observe their manner and appearance, and a much better opportunity to judge of their truthfulness than appellate court, findings and decisions of trial court have a very strong advisory weight with appellate court.

**Escrows—Evidence Sufficient to Sustain Finding That Deed was not Wrongfully Delivered.**

4. In action to cancel deed, evidence *held* sufficient to show that third party, with whom plaintiff left blank deed in escrow, had delivered deed to defendant, an innocent purchaser, in violation of instructions.

From Multnomah: JOHN P. KAVANAUGH, Judge.

*On necessity of strict compliance with condition in escrow agreement, see note in L. R. A. 1916A, 502. REPORTER.

In Banc.

This is a motion to dismiss an appeal. The transcript filed by appellant shows that on June 26, 1918, a decree was made and entered against plaintiff and in favor of defendant; that thereafter on August 25, 1918, plaintiff served and filed his notice of appeal, and seasonably filed his transcript in this court. Respondent files in this court a supplemental transcript, which shows that on July 11, 1918, plaintiff attempted to take a prior appeal by serving and filing the following notice, which stated the title of the cause and was directed to the defendant and his attorneys and read as follows:

"Notice is hereby given that the plaintiff, Joseph Rohrbacher, appeals to the Supreme Court of the State of Oregon from the judgment and decree made and entered in the above-entitled court and cause on the 17th of June, 1918, and the whole thereof.

"HOLGATE, MURDOCH & HALL,
"Attorneys for Plaintiff."

On the nineteenth day of July, 1918, plaintiff filed the usual undertaking on appeal, which was not objected to, and if the notice above quoted was sufficient the appeal became perfected. Plaintiff failed to file a transcript here in pursuance to this notice, but abandoned all proceedings thereunder on the theory that the misdescription of the decree, by assigning to it the date of the 17th of June instead of the true date, June 26th, rendered the attempted appeal void. The motion to dismiss is based upon the assumption that the misdescription was immaterial and that plaintiff having taken and perfected a valid appeal, could not thereafter abandon it and take a new appeal. It is conceded that if the first appeal could have been sustained here that defendant's contention is well founded, and

the second appeal can only be upheld on the theory that the first was void.                               OVERRULED.

*Messrs. Flegel, Reynolds & Flegel,* for the motion.

*Messrs. Holgate, Murdock & Hall, contra.*

McBRIDE, C. J.—1. On the theory that courts should be very liberal in construing appeal statutes so, if possible, everyone conceiving himself aggrieved should have the privilege of a hearing upon the merits in this court, we have sustained appeals in every case where by an inspection of the record this court was enabled to identify the judgment appealed from. In all these cases, however, there was no misdescription of the judgment in any particular, but merely a lack of data which the court was enabled to supply by an inspection of the transcript itself. Thus in *Keady* v. *United Rys. Co.,* 57 Or. 325 (100 Pac. 658, 108 Pac. 197), it was held that the undertaking on appeal might be examined to identify the judgment appealed from, citing also *Moorhouse* v. *Donica,* 13 Or. 435 (11 Pac. 71); *Salem Traction Co.* v. *Anson,* 41 Or. 562 (67 Pac. 1015, 69 Pac. 675). .

This test cannot be successfully applied here because the undertaking on the first attempted appeal is indefinite as to the date, and there is nothing in the transcript to identify the decree mentioned in the notice with that rendered on June 26th. Affidavits are filed to the effect that there was only one decree in any controversy between the parties, but the decisions have never gone to the extent of holding that such affidavits *dehors* the transcript can be resorted to, to identify the judgment appealed from. Had the appellant stood

upon his first attempted appeal it would have been dismissed here for want of jurisdiction.

2. Not having perfected a valid appeal in pursuance of the first notice, appellant was not precluded from taking a second appeal: *Watts* v. *State Spiritualists' Assn.,* 56 Or. 56 (107 Pac. 695).

The motion to dismiss is overruled.      OVERRULED.

---

Affirmed January 20, 1920.

## ON THE MERITS.

(186 Pac. 583.)

Department 2.

This is a suit in equity to set aside a deed from the plaintiff and appellant to the defendant and respondent. It seems from the evidence, that the deed in question was executed by the plaintiff in blank and left with one W. L. Cooper, an attorney in Portland, Oregon, to be delivered under certain conditions. What these conditions were, and whether or not the deed was filled out and delivered in accordance with such conditions, is the main controversy in the case. The negotiations which led up to the final transaction are confused and complicated, but, as disclosed by the evidence, they seem to have been about as follows:

The plaintiff and a man named Brown had been engaged in several real estate speculations together. Brown either held or had in his control the title to a certain 60-acre tract of land in the State of Washington, which was heavily mortgaged. It was arranged between them that plaintiff should obtain a loan for Brown in the sum of $500. As security for this loan, the tract of land was deeded to the plaintiff, with the

understanding that if he had to pay the note the land was to be turned over to him, but if he did not have to pay the note, Brown was to give him a one hundred dollar bonus for the loan.   While the title was thus standing in the name of the plaintiff, he and Brown traded this 60-acre tract of land, subject to the mortgage thereon, for certain houses and lots in Irvington, also subject to a mortgage.   The deed to this property was also taken in the name of the plaintiff, but it seems to have been recognized by all the parties that Brown had some interest or equity therein.

There seems to have been some talk and negotiation between plaintiff and Brown, in an attempted arrangement to trade this Irvington property for other property, and the deed in question was signed by the plaintiff and left with Cooper to be filled out and turned over to a purchaser when a trade should be arranged.   So far the parties are practically agreed but as to the nature of the trade which was authorized, and as to the directions which Cooper had, as to the filling out and delivery of the deed, the plaintiff and Brown and Cooper differ widely.   Plaintiff claims that he left the deed with Cooper under a definite understanding that the property was to be traded for a certain place, known as the ''Kangus'' place in the State of Washington, and that he only authorized Cooper to fill it out and deliver it, in return for title to that particular place. On the other hand, Brown and Cooper testify that it was to be exchanged directly or through certain trades, if necessary, for a designated apartment house in the City of Portland, subject to mortgages thereon.

Up to this time Strain, the defendant, had nothing to do with the transaction, but he was the owner of a farm in the State of Washington, valued at about $7,000, and subject to a mortgage of about $2,000.

Brown then proceeded to negotiate apparently a three-cornered deal, which included the property of the defendant, and by which the plaintiff was to get the apartment house, subject to the mortgage; the defendant was to have the Irvington property, subject to the mortgage on that, and was to deed the property owned by him in the State of Washington to a person designated by Brown, in apparent payment for the apartment house, though just how that part of the deal was arranged is not clear from the evidence. It seems certain that the plaintiff, if he assented to the apartment house deal at all, was intending to trade the apartment house to Kangus for the Kangus place, and a Mr. Lingren, who seems to have had the Kangus place in charge for trading purposes, was negotiating with the plaintiff for such a deal, by which that place should be exchanged for the apartment house. The trade however, fell through, and finally the mortgage on the apartment house was foreclosed and it was sold for the mortgage. Plaintiff then repudiated the deal and brings this suit against the defendant Strain to cancel the deed.        AFFIRMED.

For appellant there was a brief over the names of *Mr. P. H. Murdock, Mr. D. W. Holgate* and *Mr. H. E. Hall,* with an oral argument by *Mr. Murdock.*

For respondent there was a brief over the names of *Messrs. Flegel, Reynolds & Flegel,* with an oral argument by *Mr. John W. Reynolds.*

BENNETT, J.—The testimony of Cooper and Brown on the one side, and the plaintiff on the other, is in irreconcilable conflict as to what were the conditions of the escrow. Cooper testified that the deeds

were duly executed and acknowledged in his office and before him as a notary public, and were left there with the understanding that they were to be exchanged for the apartment house or, if that could not be obtained, then for certain land in Lincoln County, and that he held them there until the apartment house deed was brought and deposited, and then delivered them to either the plaintiff or to Brown, who were both at that time together and who took them out of the office.   He further testified:

"Q. In allowing this deed to be delivered to Mr. Brown, were you contradicting any instructions or conditions of which you were aware?

"A. Why, no; of course not, or I would not have delivered it.   And another thing too that Mr. Rohrbacher said, that I was to examine the property known as the 'Kangus' property—the title—I never heard tell of such a thing.   The only property I was to find out about the title to, was this in Lincoln County.   I never heard tell of any examination of any property in Washington for me to examine the title to.   I never tried to and had no instructions to that effect."

And again on cross-examination:

"Q. When the deeds were signed and left with you, what instructions, if any, did you have regarding the deed?

"A. To see that the title to the west half of Sec. 16, T. 13 S. R. 8 W. was in the name of Hans Bergstrom with nothing against it but the $800 and some back taxes.   They had a list of that already prepared.

"Q. There was nothing said to you whatever in regard to holding those deeds until you had received a deed running to Rohrbacher for what is known as the Kangus place?

"A. Never heard at all of that at that time or until after these deeds were delivered."

And again:

"Q. Isn't it a fact Brown and Rohrbacher came into your office that day and Mr. Brown explained to you the whole transaction, that they expected Rohrbacher's houses would go to the party that held that wild land and the one that Rohrbacher's property was to go to was the party probably who owned the apartment house, and the wild land, and Kangus was to get the apartment house for his farm, which was to be deeded to Rohrbacher?

"A. I never heard of the Kangus name until after that. The understanding was with Mr. Rohrbacher, Mr. Brown and myself that Mr. Rohrbacher was to get the apartment house, but he might fail to get the apartment house, and for fear that he would, he would take the land in Lincoln County, and he wanted to see that the title was all right to the land in Lincoln County."

Brown testified in relation to the matter, as follows:

"A. Well, we were to put in those houses, this house that Mr. Rohrbacher was interested in with me, and then a piece of property that he had over on Carruthers Street, and I was to make the exchange whereby I would get some raw land, and then after that I told him I could trade for the apartment house with Mr. Hatfield. And so I told him we wanted to investigate these transactions one by one, because there might any one of them fall down, and so the deal was made on the land. He further agreed to take the land if it had not went any further.

"Q. You refer to the Lincoln County property and the first Washington property in the transaction?

"A. Yes, sir.

"Q. Go ahead.

"A. But then I got the apartment house for him, so the deal was consummated as far as we were concerned.

"Q. (By the Court.) Begin at the beginning and detail that transaction.

"A. On the land?

"Q. (By the Court.) On the whole business; what was the first transaction that entered into this?

"A. Well, I traded one of the houses off for some land in Lincoln County.

"Q. (By the Court.) No, I mean before you got hold of this property out here at all?

"A. Mr. Rohrbacher and I?

"Q. (By the Court.) Yes, your first business deal?

"A. Well, I had 60 acres of land over here near Sifton with a $2,200 mortgage on it. There was about $2,200 encumbrance. I think the mortgage was $2,000, and I offered to sell Rohrbacher a half interest in that land for $500, and he went over and looked at it and came back and then he said that if I would take the $500 and pay off on the encumbrance he would be satisfied if he got a hundred dollars out of the deal, and he would hold it as security. And I give him the deed to that and also signed a note to the bank with him for the $500.

"Q. (By the Court.) What was the next step?

"A. Well, then I traded that off for this Irvington Heights property and had it in his name.

"Q. (By the Court.) What was the equity worth in the Washington property?

"A. Well, it had sold for about $6,000; 60 acres worth about $5,000, I guess.

"Q. (By the Court.) You mean the equity?

"A. The equity was probably $2,500 or $3,000.

"Q. (By the Court.) And then you got this property, the Irvington Heights for that?

"A. Yes, sir.

"Q. (By the Court.) How long did you hold that?

"A. A little over a month.

"Q. (By the Court.) What was the next step?

"A. Well, then I had a chance to get this land that I traded for the apartment house.

"Q. (By the Court.) Now, just detail the circumstances. That was in Mr. Rohrbacher's name and you say he had a claim of $500 against it?

"A. Well, he had $500 in the property.

"Q. (By the Court.) What was it worth?

"A. The Irvington Heights?

"Q. Yes.

"A. Well, I don't know what it is worth.   There was $2,500 or $2,300 encumbrance against it.   I guess probably it was worth about $5,000.

"Q. (By the Court.)   In addition to the encumbrance?

"A. No.

"Q. (By the Court.)   You figured that you would have an equity then of how much over Mr. Rohrbacher's $500?

"A. Well, I would have a couple of thousand dollars.

"Q. (By the Court.)   Then what did you do?

"A. Well, after that, after we made that transfer, then I had a chance to turn this property in for some land and I told him—

"Q. Where?

"A. Well, some of it was over at Washougal and the other was down in Lincoln County.   And so he agreed to make that transfer, but I mentioned at that time that I could trade this land for an apartment house.

"Q. (By the Court.)   The land you were to get the Irvington Heights property?

"A. Yes, sir.

"Q. (By the Court.)   Well, what next?

"A. Well, I made the deal for the apartment house.

"Q. (By the Court.)   Did you go out and see that?

"A. Yes, sir, we went out and looked at it, inspected it, looked at the income, how much it brought in, looked at it thoroughly, looked into it thoroughly.   Mr. Lingren took him out there.

"Q. (By the Court.)   And then what happened?

"A. Well, then, that is as far as I went with it, because then it was Mr. Lingren and Mr. Rohrbacher. They were on another deal.

"Q. (By the Court.)   Did you get the apartment house?

"A. Yes, sir.

"Q. (By the Court.)   You made the deal?

"A. Yes, sir.

"Q. (By the Court.)   In whose name was it taken?

"A. Mr. Rohrbachers. * *

"Q. Was anything said to your memory to Mr. Cooper in putting those deeds up, with reference to the Kangus place being the objective of this transaction?

"A. There was nothing said about it being the objective. Mr. Lingren told him if he made the trade and got the apartment house, he said he thought he could get him the Kangus farm. I had nothing to do with the Kangus farm."

In these matters they were corroborated to some extent by Lingren. On the other hand, plaintiff testified that the deeds were blank, except as to signature, when he left them with Cooper, and neither the description, the consideration or the name of the grantee was filled in, and that they were not acknowledged; and that the condition of the escrow was, that "he should hold the deed—and not transfer them or give them to anybody—until they got a deed for me to the Kangus place."

Mrs. Wilson, a witness called for plaintiff, testified:

"A. I heard Mr. Brown say to Mr. Rohrbacher he had come out to tell him of what he called a three-cornered deal; he had a trade for Mr. Rohrbacher's house in Portland for a piece of land, raw land, they called it.

"Q. (By the Court.) Do you know where?

"A. I could not say where, but this wild land, my understanding was to go for an apartment house, and the apartment house was to be traded or was traded— the deal was supposed to have been made, for the Kangus place at Hawkinson. Furthermore, I did not hear much because I did not stop to listen.

"Q. Was there any conversation down there looking toward or with the purport of Mr. Rohrbacher becoming the owner of either the wild land or the apartment house?

"A. Oh, I heard Mr. Rohrbacher simply say that he did not want the wild land or the apartment house, and

I heard Mr. Brown say to him that he could get the Kangus place for his property."

And Mr. Wilson testified substantially to the same facts.

3, 4. In this state of the evidence it is impossible to say with absolute certainty what was the real transaction between the parties. It is practically admitted by all parties that Mr. Strain, the defendant, was an innocent purchaser in good faith and supposed he was getting a good title and that he transferred his valuable farm to third parties in consideration of the deal. The court below heard the witnesses orally and had a chance to observe their manner and appearance, and a much better opportunity to judge of their truthfulness respectively, than we can possibly have. Under these circumstances its findings and decisions have very strong advisory weight, and where the testimony is so uncertain and conflicting and depends so entirely upon the credibility of the different witnesses, we do not feel justified in disturbing these findings.

The decree of the court below is affirmed.

AFFIRMED.

McBRIDE, C. J., and BEAN and BURNETT, JJ., concur.