884 P.2d 885 (1994)
131 Or. App. 313
In the Matter of G.P., a Child.
STATE ex rel. JUVENILE DEPARTMENT OF HOOD RIVER COUNTY, Respondent,
v.
G.P., Appellant.
930013J; CA A81113.
Court of Appeals of Oregon.
Argued and Submitted June 22, 1994.
Decided November 16, 1994.
*886 Claudia Burke, Hood River, argued the cause for appellant. With her on the brief was Jaques, Sharp & Sherrerd.
Youlee Y. You, Salem, argued the cause for respondent. With her on the brief were Theodore R. Kulongoski, Atty. Gen., and Virginia L. Linder, Sol. Gen.
Before DEITS, P.J., and RIGGS and HASELTON, JJ.
RIGGS, Judge.
Child appeals from a judgment finding him to be within the jurisdiction of the court, for committing acts which, if committed by an adult, would constitute second degree sexual abuse. ORS 163.425.[1] We review de novo and reverse.
Child, age 15, and the alleged victim, C., age 14, attended the same high school. Child dated C.'s best friend, Christina. One day after school, child and C. went for a walk in a wooded area near the high school. Child and C. give two different accounts of what happened in the woods.
According to C., child asked her to take a walk and, on the walk, asked if she wanted to have sex. She said no. Child threw her down "like a rag doll" and it hurt. She testified that the main thought running through her head was the knife that she had seen child carry in the past and that she was afraid he was going to take it out and cut her with it. Child knelt on C.'s feet and forcibly removed all of her clothes except for her sports bra. C. said "no" several times, but child had sexual intercourse with her as she lay on her back beneath child. During the entire sexual encounter, child continued to kneel on C.'s feet.
According to child, C. approached him and said that she needed to talk to him. He suggested that they go for a walk and, during the walk, she initiated the sexual encounter. He and C. had coats and sweaters, which they spread on the ground. C. was on top during the encounter, which was consensual.
Some of the events during and after the sexual encounter are undisputed. No knife or other weapon was mentioned or displayed by child at any time during the encounter. Following the encounter, child and C. both testified that they walked back to the high school together and stopped in an orchard for a cigarette. C. testified that child did not force her to accompany him. They went to a car so that child could retrieve an *887 item he needed, then entered the high school together and phoned Christina to tell her about the sexual encounter. C. testified that she was positive that she placed the call, using her own quarter. However, child and Christina testified that child placed the call. Child testified that he told Christina that she would be mad at him, but he could not tell her that he and C. had had sex. Both child and C. testified that it was C. who told Christina that they had had sex. Child testified that he felt guilty about the encounter and told C. so. C. testified that she told Christina about the sexual encounter "because [she] was afraid for [Christina's] safety," but she did not tell Christina that child had raped her, because she was afraid child would "come after her [C.]." Drew, a school administrator, saw child and C. around the time of the phone call. Drew testified that child and C. behaved "like two people that seemed as if nothing had happened."
C. then rode the bus home. On the bus, she told a friend, Melinda, about the encounter. C. testified about her conversation with Melinda:
"I didn't go into details with her, but I  I had to tell somebody because I was bursting with anger and I was frustrated and I didn't know what to make of what happened yet. And I told her that I had sex willingly with [child]."
C. also testified that she discussed the sexual encounter with her father that evening:
"A: Yeah, I told my dad that I had mutual sex.
"Q: Okay. Why did you tell your dad?
"A: Because me and my dad have a really good relationship and I tell him everything.
"Q: But you didn't tell him you'd been raped?
"A: No, `cause II was scared and I was embarrassed and I wasn't quite sure what to make of it yet, again, and Ithey didn't really do nothing. I justI was crying like crazy `cause I wanted to tell them."
C. also testified that the evening of the alleged rape, Christina phoned C. and called her "a bunch of names."
The day after the sexual encounter with child, C. told the school counselor that she had been raped. The counselor called the police. Wampler, one of the officers who interviewed C., testified that C. stated that she ended up on the ground because she tripped on a root and fell backwards and that child, not C., called Christina. At the time of the interview, C. appeared to be embarrassed and scared. Tubbs, the other officer who interviewed C., testified that C. said that child had called Christina and that C. made no reference to thinking about a knife when she described the sexual encounter.
Dr. Pendleton, who was C.'s pediatrician, examined C. the day after the alleged rape. He testified that he found some trauma to her perineum, but no bruising or scratches anywhere else on her body. Pendleton testified that the level of trauma he discovered in his exam could be the result of either consensual or non-consensual sex:
"Q. Okay. Well, I think you testified that it's possible to avoid these injuries [to the perineum], but intercourse must be  and Ithese are youryour wordsvery, very slow. Is that right?
"A. Penetration must be very, very slow.
"Q. Okay. Alright.
"A. Very, very slow.
"Q. Okay."
Pendleton testified that even an aggressive pelvic exam could inflict the same trauma, and he was equivocal when asked if the extent of injuries was consistent with non-consensual sex:
"A. Getting back to theto the issue of the emotional trauma, it's not at all unusual for individuals to bebe raped, for women to be raped and not have any injury other than what's to their perineum.
"Q. Not unusual, but not common either, is it?
"A. I don't know how to answer that. It'sityou know, itYou see it, and I can't give you a percentage. ProbablyI justand II couldn't speculate."
The juvenile department filed a petition alleging that child was within the jurisdiction *888 of the court, because he committed an act which, if done by an adult, would constitute first degree rape. ORS 163.375. The petition was later amended to add an allegation that the act, if committed by an adult, would constitute second degree sexual abuse. ORS 163.425. Pendleton, Wampler, Tubbs, Drew, Christina, C., C.'s therapist, child, two employees of the juvenile department and several teenage witnesses appeared and testified at the hearing.
Several of the teenage witnesses testified, without objection, that C. had accused another teenage boy of rape approximately two weeks before the alleged rape by child. They also testified that C. had a poor reputation for truthfulness. Drew and the juvenile department employees testified that child and many of the teenage witnesses (excluding C.) had poor reputations for truthfulness.
The state offered the testimony of C.'s therapist to explain inconsistencies in C.'s account of the alleged rape. The therapist theorized that C. was traumatized by the encounter and that the reason she told her father and friends that the encounter was consensual was that she was "trying to understand what happened to her." According to the therapist, victims of trauma are frequently confused:
"A: [A]fter what has happened and her brain has become disorganized during the trauma, she may not make a lot of sense the next days or weeks even. She may not interpret what happened to her in a way that uses logic or that we would understand.
"* * * * *
"Q: And it's always possible that she may not rebe able to relate all the details of the event because they simply didn't happen that way?
"* * * * *
"A: I don't have great experience working with people who make up stories or lie about these things, so I really can't answer that."
The trial court found that the sexual encounter was non-consensual but did not find that there was forcible compulsion. As a result, the court found child to be within the jurisdiction of the juvenile court on the charge of sexual abuse in the second degree and dismissed the charge of rape in the first degree. The court stated that it relied primarily on the testimony of child, Pendleton and C. The court did not make express credibility findings of witnesses who testified on key issues.[2] However, based on the result that it reached, the trial court must have rejected some portions of C.'s account of the alleged rape. The trial court's result also implies that it rejected all or part of child's testimony.
We review de novo. ORS 419A.200(5). The facts alleged in the petition showing that child committed second degree sexual abuse must be established beyond a reasonable doubt. ORS 419C.400(2). We give deference to the trial court's credibility findings. State ex rel. Juv. Dept. v. Greenwood, 107 Or.App. 678, 680-81, 813 P.2d 58 (1991). The degree of deference we give varies with the importance of the trial court's opportunity to observe the witnesses, Brunswick v. Rundell, 126 Or.App. 582, 586, 869 P.2d 886 (1994), and our ability to discern the trial court's specific credibility determination. In a rape or sexual abuse case, the trial court's opportunity to observe the demeanor of the defendant and the complainant is important. However, demeanor is not the only measure of credibility; internal consistency, logic, and corroboration also guide us. To the extent that a credibility determination is based on a comparison of the witness' testimony with the substance of other evidence, this court is as well equipped as the trial court to make that credibility determination. In re Schenck, 318 Or. 402, 420, 870 P.2d 185 (1994).
C.'s testimony was internally inconsistent and conflicted with much of the other evidence in this case. We first note major discrepancies between what C. told law enforcement officers and what she said at the *889 hearing. C. never mentioned child's knife to the school counselor, Tubbs, Wampler or any other person investigating the incident. However, at trial, she testified:
"Q. * * * So I guess when this was happening, that ... that knife was really the main thing you were thinking of, huh?
"A. Yeah, and to stay alive.
"Q. He was afraidyou were afraid he was going to take you ... take it out and cut you with it?
"A. Yeah."
It seems inconceivable that C. never mentioned the object that caused her to fear for her life to the people investigating this incident. In addition, when C. was interviewed by Wampler, she told him that she ended up on the ground when she tripped over a root. At the hearing, she testified that child threw her down like "a rag doll." C. also testified that child had his knees on her feet throughout the rape. The near impossibility of such a feat, coupled with the fact that there was no bruising anywhere on C.'s lower legs or feet, calls into question her version of the incident.
Perhaps most troubling is the fact that she voluntarily told three different people that she had had consensual sex with child. One of the people she told was Christina, her best friend and child's then girlfriend. C. testified that she called Christina because she was "concerned for her safety," that child had raped her and might do the same to Christina. However, she made this phone call with child, the very person she was concerned would harm Christina, standing next to her. Substantial portions of C.'s testimony are internally inconsistent, incoherent and not credible.
These inconsistencies are not reconciled by the physical and medical evidence. Although C. testified that she was raped after being pushed, falling hard and being held down virtually naked on the ground in a wooded area, the physical examination the next day revealed no scratches or bruises on her back, legs, or buttocks.[3] Moreover, although the state points to the trauma to C.'s perineum as corroborating her testimony, any corroboration was equivocal. Pendleton testified that such trauma could be consistent with either the sort of assault C. described or consensual sex that was not "very, very slow."
Finally, the testimony of C.'s therapist is inadequate to repair the material inconsistencies in C.'s account and the consequent lack of credibility. The therapist testified that complainants in rape cases generally change their accounts of events in an effort to "understand what happened to them" and that all variations of C.'s testimony resulted from trauma. We recognize that trauma can commonly interfere with a victim's ability to recall events. However, the therapist's testimony here is reduced to the proposition that any statements by the alleged victim, no matter how incredible or how inconsistent, are to be discounted as the product of post-traumatic stress. Thus, in the therapist's view, a description of a sexual encounter as being consensual is just as consistent with rape as the obverse. Viewed de novo on this record, such testimony is insufficient, without other, objective corroboration, to explain the inconsistencies in C.'s account.
We are very troubled by this case; however, because proof of guilt must be beyond a reasonable doubt, we believe no other result is possible. The dissent calls this "a classic case of `his word against hers.'" This is not a classic case, because, in this case, both his word and her word are highly questionable in material particulars. We cannot say on de novo review that there is no reasonable doubt when the only two witnesses give diametrically opposed accounts, both of which are highly questionable, the medical evidence is only slightly better than equivocal and there is no other corroboration in the record. In sum, the evidence in the case does not show, beyond a reasonable doubt, that child committed acts which, if done by an adult, would constitute sexual abuse in the second degree. We reverse the judgment finding him to be within the jurisdiction of the court.
Reversed.
*890 HASELTON, Judge, concurring.
After reviewing the record de novo, only one thing seems certain: Both C. and child were not credible. This was not a simple "swearing match." It was, rather, a case in which both the complainant's and the alleged perpetrator's accounts were internally inconsistent and frankly unbelievable in critical respects.
The majority opinion details the myriad material contradictions in C.'s account. 131 Or.App. at 319-320, 884 P.2d at 888-889. Individually, one or two might be explainable. Collectively, they greatly undermine C.'s credibility.
For his part, child was also materially unbelievable. He testified that C. proposed having sex with him and that he went along, feigning drunkenness, because he and his girlfriend, Christina, had an "understanding" to "see how far [C.] would go."[1] Even in the often ambiguous world of adolescent relationships, that just doesn't make sense.
Nor is the medical testimony a sufficient "tie-breaker." That evidence, although more consistent with a conclusion of non-consensual activity, was equivocal in some important respects. In addition to those statements set out in the majority opinion, Dr. Pendleton opined:
"I think that this is one of the situations where perhaps it gets down to who says what. From my perspective, the findings, the * * * history and physical [sic ] were consistent with assault with force applied to the perineum. I think that the context that consensual sex occurs in does not cause this type or this extent of injury.
"Q. [By defense counsel]: So, when you say it gets down to who says what, that is essentially whether you believe * * * whether you choose to believe a person or not?

"A. That's correct."[2] (Emphasis supplied.)
That testimony was not so compelling, given C.'s material lack of credibility, as to establish second degree sexual assault beyond a reasonable doubt.
Viewed de novo, this record seems to reek of reasonable doubt. Nonetheless, even in this de novo review context, the trial court's dispositionthe adjudication of second degree sexual assault, which did not accord with either party's accountmight have been sustainable if the court had (1) stated that it believed certain aspects of C.'s testimony, but not others; and (2) explained why, perhaps with reference to witness demeanor. But it did not do that.
The dissent observes, correctly, that we ordinarily do not require explicit credibility determinations before deferring to a trial court's findings that depend on credibility. 131 Or.App. at 324-325, 884 P.2d at 891. Where, however, a trial court's disposition rests on the credibility of a witness whose testimony was demonstrably and materially inconsistent and incredible, that disposition cannot be entitled to "credibility" deference without some enlightening explanation.[3] Any other approach places us in the position, as we were in this case, of attempting to guess what aspects of a witness's testimony the trial court found credible, and why.
The material contradictions in C.'s account raise reasonable doubt that is not overcome *891 by the less than compelling medical evidence. I concur.
DEITS, Presiding Judge, dissenting.
The majority holds that the trial court erred in concluding that child was within the jurisdiction of the juvenile court. I disagree with the majority's application of our standard of review and its reading of the evidence. Accordingly, I dissent.
As the majority notes, we review juvenile matters, as we do suits in equity, de novo. ORS 419A.200(5); ORS 19.125(3). After stating that standard, however, the majority describes our review as follows:
"We give deference to the trial court's credibility findings. State ex rel Juv. Dept. v. Greenwood, 107 Or App 678, 680-81, 813 P2d 58 (1991). The degree of deference we give [`]varies with the importance of the trial court's opportunity to observe the [demeanor of the] witnesses,['] Brunswick v. Rundell, 126 Or App 582, 586, 869 P2d 886 (1994), and our ability to discern the trial court's specific credibility determination." (131 Or.App. at 318-319, 884 P.2d at 888.) (Emphasis supplied.)
My first concern is with the majority's focus on credibility "findings." Although we previously have discussed giving deference to "credibility findings," see, e.g., State ex rel. Juv. Dept. v. Greenwood, supra, or "credibility determinations," see, e.g., State ex rel. Juv. Dept. v. Beyea, 126 Or.App. 215, 217-18, 867 P.2d 565 (1994), those phrases are somewhat imprecise statements of the nature of our review. The essence of de novo review is that we may disregard the factual findings of a jury, or a judge acting as a fact finder, and decide the facts anew upon the record. However, the reality is that when we are faced with conflicting testimony, we run the risk of drawing inferences from a cold transcript that we might not draw if we had the opportunity to see the witnesses' demeanor and to hear the tone of their voices during the course of the trial. Consequently, Oregon appellate courts have long recognized that, even though our review is de novo, when there is conflicting testimony on factual issues, we give considerable weight to the trial court's findings of fact, which reflect the court's judgment as to the witnesses' credibility. See Rohrbacher v. Strain, 95 Or. 1, 12, 186 P. 583 (1920) (concluding that the trial court's findings "have very strong advisory weight" because the court heard the witnesses, observed their manner and appearance, and had "a much better opportunity to judge of their truthfulness * * * than we can possibly have"); see also Krueger v. Ropp, 282 Or. 473, 478, 579 P.2d 847 (1978) ("Although we review equity cases de novo, we give substantial weight to the trial court's findings where * * * those findings depend on the resolution of conflicting testimony and the credibility of the witnesses."); Ollman v. Active Homes, 278 Or. 113, 115, 562 P.2d 1217 (1977) ("As we have frequently said, in reviewing evidence de novo considerable weight is to be given to the trial judge's decision where it rests upon his appraisal of the credibility of the witnesses."); Adamson v. Adamson, 273 Or. 382, 389, 541 P.2d 460 (1975) ("where the testimony is conflicting and the evidence is in equipoise, the credibility of the witnesses is decisive and we give considerable weight to the findings of the trial court even though we try the case de novo"); Seitz v. Albina Human Resources Center, 100 Or.App. 665, 674, 788 P.2d 1004 (1990) (same, in context of unlawful employment practice); Hampton v. Sabin, 49 Or. App. 1041, 1047, 621 P.2d 1202 (1980), rev. den., 290 Or. 519 (1981) (same, in context of rescission of contract); State v. Watkins, 35 Or.App. 87, 89, 581 P.2d 90 (1978) (civil commitment); State ex rel. Juv. Dept. v. Maves, 33 Or.App. 411, 416, 576 P.2d 826 (1978) (termination of parental rights).
Our past comments about giving deference to "credibility findings," then, are more properly understood as restatements of the above principles. In this case, however, the majority confuses what is already a less than precise statement, by requiring that a trial court make a "specific credibility determination" in order to merit deference. If the majority is suggesting that we defer to credibility determinations only when such determinations are explicit in the record, that proposition makes little sense because, as discussed above, our deference is more properly accorded to factual *892 findings, not to credibility findings. If, on the other hand, the majority is suggesting that a trial court's factual findings are entitled to deference only when they are based on explicit credibility determinations, that proposition represents a significant change in our review of cases like this, a change for which the majority offers no authority or rationale.[1] In my view, although it is helpful to this court in reviewing a trial court's decision, the court's failure to outline specifically who it finds to be credible and why does not preclude us from giving deference to the trial court's firsthand appraisal of the testimony adduced at trial and its consideration of that appraisal when resolving factual disputes that turn on the witnesses' credibility.
In accordance with our established standard of review in these cases, I believe that we should give substantial weight to the factual findings of the trial court when the credibility of the witnesses is decisive in making those factual findings. That does not mean, however, that the resolution of every issue of disputed fact will depend on the trial court's judgment regarding which of the witnesses to believe. Of course, when the record contains other persuasive evidence as to a factual issue, witness credibility is not decisive. Further, we may accord less weight to a trial court's findings when the conflicting evidence comes from expert witnesses, whose manner and demeanor during trial may be less crucial to evaluating credibility than would be an analysis of their reasoning. See McCoy and McCoy, 28 Or.App. 919, 924, 562 P.2d 207, mod., 29 Or.App. 287, 563 P.2d 738 (1977). Finally, regardless of how well a witness may comport himself or herself while testifying, we may conclude that other factors, such as the inherent improbability of the testimony, the possible internal inconsistencies in the testimony or extrinsic evidence of the witness's credibility, are so persuasive as to render the trial court's findings untenable. In such cases, the weight we accord the trial court is appreciably diminished.
In this case, the majority rejects the trial court's factual findings, apparently because it concludes that internal inconsistencies in C.'s testimony and extrinsic evidence of her lack of credibility are so overwhelming that those findings are insupportable. I disagree on both counts.
As to the internal inconsistency of C.'s testimony, the majority first identifies "major discrepancies" between what she told law enforcement officers and what she said at the hearing. The majority first notes that C. did not tell anyone about child's knife. C. testified that during the sexual encounter, she was afraid that child was carrying, and might use, a knife that she had previously seen in his possession. However, she also testified that child never actually mentioned or displayed a knife and that she did not discuss the knife with the police. Given that C. was reporting what did happen to her, not what she feared might have happened, and that her fears about the knife might have been unfounded, I do not see her failure to mention the nonexistent knife to the police as an "inconsistency" in her testimony.
Although I agree with the majority that the statement C. made to the officers about how she ended up on the ground was inconsistent with her testimony at the hearing, the resolution of that factual issue is immaterial to the crime for which child was found to be within the jurisdiction of the juvenile court, sexual abuse in the second degree. Further, I do not believe that that inconsistency is such persuasive evidence of C.'s general lack of credibility that we should disregard the trial court's factual findings on material issues, such as whether C. had consensual sex with child.
The majority also states that it is troubled by the fact that C. told three different people that she had consensual sex with child. At the hearing, C. did not deny that she told those people that she had willingly had sex with child. She testified that, shortly after the encounter, she told Christina, child's girlfriend, and Melinda, a girl that child had been talking to while C. was on the phone with Christina. She also testified that, several hours later, she told her father. *893 When asked why she told those people that she had willingly had sex with child, C. testified that she was in a state of shock and did not know what to make of what had happened to her and that she was embarrassed.
In rejecting the trial court's finding that C. did not consent to having sex with child, the majority is also rejecting that court's belief in C.'s explanation for why she initially told people that the encounter was consensual. Unlike the majority, I do not believe that her explanation was so improbable, nor the above inconsistencies so compelling, that we should take it upon ourselves to deem her testimony noncredible, based solely on our reading of a cold transcript. In my view, this is the very reason why, in appropriate cases and despite our de novo review, we give substantial weight to the trial court's factual determinations.
In addition to what it views as internal inconsistencies in C.'s testimony, the majority apparently believes that the record also contains extrinsic evidence of C.'s lack of credibility. For instance, the majority states:
"Although C. testified that she was raped after being pushed, falling hard and being held down virtually naked on the ground in a wooded area, the physical examination the next day revealed no scratches or bruises on her back, legs or buttocks." 131 Or.App. at 320, 884 P.2d at 889.
The majority, however, cites only part of the evidence relevant to that issue. First, C. testified that, on the day of the incident, she wore leggings underneath her jeans, a turtleneck, a big sweater and a jacket. Contrary to the majority's implication, she had on several layers of clothing when she hit the ground. Second, although C. testified that she could not move when child pinned her to the ground after removing her clothing, she also testified that she did not try to get up, that she was "basically paralyzed" and that she did not do anything physically to resist him.
The majority places little reliance on the testimony of Dr. Pendleton, who conducted the physical examination of C. It concludes that any corroboration of C.'s testimony by Pendleton's description of her physical trauma was "equivocal." 131 Or.App. at 320, 884 P.2d at 889. I strongly disagree with that characterization of Pendleton's testimony. He testified that the exam closely supported C.'s statement of what had happened. On cross-examination, child's counsel questioned the doctor further:
"Q. Well, given the fact that she reported to you that her clothing was entirely removed, with the exception of her bra, and that she was raped on the ground, it's inconsistent, is it not, that she had no bruises or abrasions on her buttocks or her back?
"A. I can say that I have seen individuals in similar circumstances and have read about them and have heard about them in similar circumstances who make the same claims, who have the same findings that she does. So I can't say that it's inconsistent. No, sir.
"Q. But you would expect to see those types of ...
"A. One might expect it. Certainly if you had seen it, it wouldn't be inconsistent with ... with her test ... with what she says. But in all honesty, I don't know that I can say that it's entirely inconsistent. No."
Reading the evidence as a whole, I do not believe that the absence of scratches or bruises is persuasive evidence of C.'s lack of credibility on the issue of consent.
I believe that the majority's characterization of that evidence as equivocal is based on its failure to consider Pendleton's entire testimony; instead, it relies on selective quotations of his testimony. On direct examination, Pendleton described in detail C.'s injuries. In response to the prosecutor's question as to how he would characterize an encounter that would produce those kinds of injuries, the doctor responded:
"I think that the entry of the pene ... of a penetrating object into the vagina would have to be something that was forceful and persistent. And ... and then maybe I should clarify that a little bit, and ... and I apologize for adding on. It's ... it's possible to have in ... to have penetration of a vagina, even of one that is not sexually *894 experienced, and not cause trauma like this, but it has to be very, very slow * * *. This is something that was done with ... in my opinion, with force and not slow at all. It caused injury."
On cross-examination, the following exchange took place:
"Q. Doctor, many of the things that you've noted, for instance the bruising [to the hymenal ring] in your diagram and so forth, are all consistent with consensual sex. Correct?

"A. No. Consensual sexit's something that can be seen with particular rough consensual or rough athletic sex, but it is no way consistent with routine consensual sex.

"Q. Okay. Consistent to a greater degree with consensual sex for the first time. Correct?

"A. No. I don't think that the ... the amount of injury to the perineum is consistent with consensual sex in somebody who has a virginal introi ... or virginal vagina. * * * That ... that typically may involve minor irritation, but this was a significant amount. * * *
"* * * * *
"Q. Okay. So it seems ... seems to me that what you're saying is those injuries could be caused even byor these types of injuries at least could be caused even by an exam if you're not very careful about it?
"A. Again, I think that this kind of injury is out of bounds of the common examiner. I think that ... that the exam, if this was done by a physician, would have to be extremely, extremely aggressive.

"* * * * *
"A. * * * I think that ... that in this situation certainly what she was saying and what my observationsand ... and the nature of my obser ... observations led me to believe that this was not consensual, that this was assaultive.

"Q. But give[n] your findings, you certainly can't say that conclusively, can you?
"A. I think that this is one of those situations where perhaps it gets down to who says what. From my perspective, the findings, the ... the history and physical were consistent with assault with force applied to the perineum. I think that the context that consensual sex occurs in does not cause this type or this extent of injury." (Emphasis supplied.)
Pendleton's testimony was not "equivocal." His statement that trauma could be avoided if penetration was "very, very slow" does not detract from his opinion that C.'s injuries were "in no way consistent with routine consensual sex" and that "this was assaultive." (Emphasis supplied.) In my view, reading Pendleton's testimony as a whole, the physical evidence was strongly corroborative of C.'s testimony that she did not have consensual sex with child.
In summary, I believe that this is a classic case of "his word against hers," in which the trial court is in the best position to resolve factual issues which turn on the witnesses' credibility. There is more than adequate evidence in the record to support the court's factual findings and, absent persuasive reasons to do so, we should not disregard those findings in the light of the trial court's unique opportunity to observe the witnesses throughout the course of the hearing. Thus, I believe that the trial court did not err in finding that child committed acts which, if committed by an adult, would constitute sexual abuse in the second degree.
I respectfully dissent.
NOTES
[1] ORS 163.425(1) provides:

"A person commits the crime of sexual abuse in the second degree when that person subjects another person to sexual intercourse, deviate sexual intercourse or, except as provided in ORS 163.412, penetration of the vagina, anus or penis with any object other than the penis or mouth of the actor and the victim does not consent thereto."
[2] The court found one of child's witnesses not credible, but her testimony is unnecessary to our holding.
[3] C. testified that she did not bruise easily.
[1] Christina denied any such "understanding."
[2] Dr. Pendleton had been C.'s family physician for five and a half years at the time of the alleged assault, and was unfamiliar with child's account of the incident.
[3] Accord In re Schenck, 318 Or. 402, 420-21, 870 P.2d 185, cert. den., ___ U.S. ___, 115 S.Ct. 195, 130 L.Ed.2d 127 (1994):

"Even on de novo review, determinations of credibility are given significant weight when based on the factfinder's perception of a witness's demeanor. Clauder v. Morser, 204 Or 378, 391-92, 282 P2d 352 (1955). * * * The weight that we accord to the credibility determination based on demeanor also is informed by the fact that the Commission [on Judicial Fitness and Disability] went beyond a mere recital of conclusions about demeanor to state the basis for its conclusions. To the extent, however, that the credibility determination is based on a comparison of the substance of the witnesses' testimony with the substance of other evidence, then this court on de novo review is as well equipped as is the Commission to make that record determination." (Emphasis supplied.)
[1] Interestingly, the majority never addresses whether it has discerned this trial court's "specific credibility determination" and, if not, what impact the lack of such a determination has on our review.