Argued and submitted October 12, 2009, reversed and remanded April 21, petition for review denied September 17, 2010 (349 Or 56)

William M. LISOSKI,
*Plaintiff-Appellant,*

*v.*

Diane BROEHL,
fka Diane Holzgraf,
*Defendant-Respondent.*

Multnomah County Circuit Court
070302589; A138890

230 P3d 63

John Dudrey argued the cause for appellant. With him on the briefs was Williams, Fredrickson, LLC.

Clayton C. Patrick argued the cause and filed the brief for respondent.

Before Haselton, Presiding Judge, and Armstrong, Judge, and Rosenblum, Judge.

ROSENBLUM, J.

## ROSENBLUM, J.

This is a declaratory judgment action in which we must decide which of the parties is the legal owner of a pleasure boat. In August 2006, the boat was in the possession of American Yacht Brokers (AYB), purportedly on consignment from defendant, its legal owner. Plaintiff paid AYB for the boat and took possession of it, but he did not receive a certificate of title. AYB went out of business shortly thereafter and failed to pay defendant for the boat. Several months later, defendant retook possession of the boat, claiming that AYB had sold it without her permission. Plaintiff brought this action seeking a judgment declaring that he is the legal owner of the boat, ordering defendant to return it to him, and awarding him damages. Plaintiff contended that defendant had either entrusted the boat to AYB on consignment or acquiesced in AYB's possession of it, that he had purchased the boat in the ordinary course of AYB's business, and that, as such, he is the boat's legal owner. After a bench trial, the court ruled in defendant's favor, and plaintiff appeals. We reverse and remand.

■ At the outset, we must determine the standard by which we review the facts, which the parties dispute. Plaintiff contends that this action is equitable in nature because he seeks a declaration concerning the ownership of personal property. Thus, he argues, we review the record and find the facts *de novo*. Defendant asserts that the real issue is whether she entered into a contract entrusting the boat to AYB, and she argues that we are bound by the trial court's findings on the disputed facts underlying that issue as long as there is any evidence in the record to support them.

■■ "Declaratory judgment proceedings can be legal or equitable in nature, depending on the nature of the case and the relief sought." *Ken Leahy Construction, Inc. v. Cascade General, Inc.*, 329 Or 566, 571, 994 P2d 112 (1999). To determine the nature of the case and the relief sought, we look to plaintiff's complaint. *Thompson v. Coughlin*, 329 Or 630, 637-38, 997 P2d 191 (2000). In the complaint, plaintiff sought a judgment declaring that defendant had no right to take possession of the boat in question; that she had no right to continue in its possession or to use, alter, or sell it; that she must

return possession of the boat to plaintiff immediately and transfer title to it to plaintiff; and that she is liable for damages if the boat has been damaged, destroyed, or sold.

■■ The declarations that plaintiff sought with respect to rightful possession of the boat are in the nature of a replevin claim. *See McCargar, et al. v. Wiley*, 112 Or 215, 220, 229 P 665 (1924) ("The issue to be litigated in an action in replevin is the present right to the possession of the property in controversy."). Replevin is an action at law. *Brandt v. Brandt*, 215 Or 423, 444-45, 333 P2d 887 (1958). However, a plaintiff cannot prevail in a replevin action against a defendant who holds legal title to the property in question, as defendant does in this case. *Brown v. Sheedy*, 90 Or 74, 84, 175 P 613 (1918). Thus, plaintiff's claim for a declaration as to rightful possession cannot provide complete relief unless plaintiff also receives the title to the boat.

■ Plaintiff's claim for a declaration requiring defendant to convey title to the boat is, in effect, a claim for injunctive relief, which is equitable in nature. *See Boyes v. Ramsden*, 34 Or 253, 256, 55 P 538 (1899) (" 'The delivery up of deeds and other instruments to the party entitled to them, when they are improperly withheld, is an ancient head of equity jurisprudence.' " (Citation omitted.)). An action is equitable if the equitable relief sought is more complete than the legal relief. *Geary v. Prudhomme*, 117 Or 165, 171, 243 P 101 (1926); *see also Alsea Veneer, Inc. v. State of Oregon*, 318 Or 33, 43, 862 P2d 95 (1993) (equitable relief does not lie if there is an adequate remedy at law, but the remedy at law must be "practical, efficient, and adequate, as full a remedy as that which can be obtained in equity"). Because plaintiff's claim seeking a declaration that he, rather than defendant, has the right to possess the boat and his claim for damages would not provide complete relief without an injunction ordering defendant to transfer the title to plaintiff, we conclude that the action is equitable. It follows that our review is *de novo*.

Accordingly, we review the material testimony and documentary evidence in some detail. To place the evidence

in context, we begin by giving a brief overview of the undisputed events that led to this action, followed by the legal principles that pertain to our decision.

The boat in question, a 29-foot Sea Ray, was originally owned by defendant, a supervisor at a title and escrow company. She kept it moored in slip number 324 at a marina in Portland. The marina was also home to AYB, which was in the business of selling boats on consignment.[1] AYB occupied half of rows six and eight and all of row seven at the marina. In April 2006, defendant's son, Joshua Kauffman, discussed defendant's boat with Hodgie Nicklos, an AYB employee, and signed a listing agreement authorizing AYB to sell it. The agreement provided, among other things, that "AYB shall accept possession of the goods, on consignment, and sell the goods for account of the Owner at the agreed net price." Kauffman told Nicklos that the boat belonged to defendant. At some point thereafter, Kauffman moved the boat to another slip at the marina.

In August 2006, plaintiff went to AYB looking for a boat to buy. Tom Rials, one of AYB's salesmen, showed plaintiff defendant's boat, and plaintiff ultimately agreed to buy the boat, signing a "used boat offer agreement." On August 28, he obtained a loan from his credit union for $65,000 and gave AYB a cashier's check in that amount. The next day, plaintiff took the boat to a private slip behind his home on the Columbia Slough.

Also on August 29, Rials sent defendant an e-mail stating, "Would you please return this email confirming the net price of the Sea Ray to be $57,500. We also need a copy of the boat title, front and back. Our fax number is * * *. Thank you so much for letting us sell your boat." Rials did not tell defendant that plaintiff had already paid for the boat. Within approximately half an hour, defendant replied, "I had faxed a copy of the title some time ago . . . will send it again

---

[1] The owner of AYB, Marc Sprague, previously owned another yacht brokerage, Yacht Spot, Inc., that occupied the same location as AYB. Sprague testified that, in 2005, because Yacht Spot was experiencing financial difficulties, he dissolved that company and started AYB. He testified that he continued to use "Yacht Spot" as the "location name" even though that business had ceased. Various documents in the record use both business names. For simplicity, we refer only to AYB in this opinion.

this evening. Before I confirm the price I need you to confirm that all fees for moorage and any other incidentals are waived." Rials responded by confirming that moorage fees and any incidental charges originating from AYB were waived. In her final e-mail reply, defendant agreed to the net price but stated that she wanted to receive payment before plaintiff took possession of the boat.

Defendant heard nothing further from AYB and did not receive payment for the boat. AYB declared bankruptcy and went out of business shortly thereafter. Several months later, defendant went to the marina and discovered that the boat had indeed been sold. With the help of the Multnomah County Sheriff's Department river patrol, defendant was able to locate the boat behind plaintiff's home, and she retook possession of it. Kauffman later called plaintiff and told him that he and defendant had taken the boat.

Plaintiff filed this action alleging that AYB was a merchant dealing in the sale of pleasure boats on consignment, that defendant had entrusted the boat to AYB, and that plaintiff had bought the boat in the ordinary course of AYB's business. Thus, he alleged, he had acquired all of defendant's interest in the boat.

■     The primary issue in this case is whether defendant entrusted the boat to AYB. That is so because ORS 72.4030(3) provides, "Any entrusting of possession of goods to a merchant who deals in goods of that kind gives the merchant power to transfer all rights of the entruster to a buyer in ordinary course of business." Under that statute, if defendant entrusted the boat to AYB, AYB had the power to transfer ownership and possession of the boat to plaintiff.[2] ORS 72.4030(4) defines "entrusting":

> " 'Entrusting' includes any delivery and any acquiescence in retention of possession regardless of any condition expressed between the parties to the delivery or acquiescence and regardless of whether the procurement of the

---

[2] Defendant contends that entrustment is not the sole issue before us, arguing that AYB was not a merchant who dealt in "goods of th[e] kind" at issue here and that plaintiff was not a buyer in the ordinary course of business. We reject those arguments without discussion.

entrusting of the possessor's disposition of the goods have been such as to be larcenous under the criminal law."

Thus, if defendant delivered possession of the boat to AYB or acquiesced in AYB's retention of possession of the boat, AYB had the power to transfer defendant's rights in the boat. If AYB had that power when it sold the boat to plaintiff, he is its rightful owner.

With those principles in mind, we turn to the pertinent evidence in the record. Plaintiff called defendant as the first witness. Plaintiff's counsel showed defendant a printed copy of the e-mail exchange with Rials described above, and she acknowledged having sent and received the messages. Defendant testified that she understood Rials's initial message asking her to confirm the price and to send a copy of the title as follows: "I just thought he had found someone who was interested in purchasing the boat." She explained the concern about fees for moorage and "incidentals" expressed in her first reply to Rials by stating, "I just didn't know what kind of charges or costs might have been incurred. I knew that Josh had moved my boat * * * and I didn't know what had been—I just didn't know what other costs could be incurred."

Defendant later testified that she had not given permission to Kauffman to sign a listing agreement or to sell the boat and that he did not have permission to use the boat unless she was with him.[3] She acknowledged that there was "a time that [she] became aware that * * * [Kauffman] had some dealings with Hodgie Nicklos" and that she reprimanded him for his actions. However, defendant testified that she did not believe that she had transferred possession of the boat to AYB.

Plaintiff also called Rials to testify. He testified that he began working for AYB in July 2006, after the boat in question had been listed for sale. Among other things, he also said that, when he showed the boat to plaintiff, it was moored in row six, immediately behind AYB's office.

---

[3] Defendant retook the stand and testified as part of her own defense. For convenience, we describe all of the material aspects of her testimony together.

After plaintiff concluded his case-in-chief, defendant called several witnesses, including Kauffman. He testified that defendant had never let him take the boat out by himself unless he was meeting her somewhere with it, but he admitted that he had, at times, taken it out without her knowledge. Kauffman testified that defendant had not given him permission to list the boat for sale or to move it from her slip at the marina. He also testified that he had never agreed with Nicklos to list the boat for sale and had only asked him to find out how much the boat was worth. Kauffman said that he had earlier suggested to defendant that she sell the boat and buy a recreational vehicle or a motorcycle and that she had rejected the idea. He said that, even though "[i]t was pretty much dead at that point," when he discussed the boat's value with Nicklos, he was "kind of following through with [those] ideas * * *."

Kauffman refused to acknowledge that he had signed the listing agreement, which was signed in his name on both the front and the back. When asked if the signature was his, he stated, "It would appear to be my name," but he said that he writes his name in several different ways and that he "could not be positive that that [was his] signature." Kauffman did acknowledge that he has signed "something" with Nicklos. He testified that Nicklos had told him that he "needed to sign a piece of paper for what he called his Webmaster so that they could take some pictures of the boat." He said that he had signed the paper without reading it.

Kauffman also testified that he had moved the boat from defendant's slip:

"Q   What berth was the boat tied at? What slip was it at when you had this conversation with Mr. Nicklos?

"A   I believe it was 324.

"Q   And did you visit the boat at all in the next four months?

"A   I probably had stopped down there a couple times, yes.

"Q   Was it still at Berth 324?

"A   For the next four months, no.

"Q   Okay. Where was it?

"A   I moved it to, I believe, 536."

He was not asked, and did not explain, why he had moved the boat. He said that, to his knowledge, the boat was never moored in row six at the marina.

During closing arguments, the trial court suggested that it had "very little confidence in testimony of anybody that's related to [AYB]." After the trial concluded, the court issued written findings and conclusions. It expressly found that the testimony of defendant and Kauffman was credible and that the testimony of Nicklos, Rials, and Sprague was not credible. The court also found that AYB had offered the boat for sale without defendant's knowledge or consent and that there was no credible evidence that defendant had known that AYB had possession of the boat or could deliver possession to a buyer without her approval. The court concluded that plaintiff had not met his burden of proof and therefore entered judgment in defendant's favor. This appeal followed.

The dispositive question before us is whether plaintiff proved, by a preponderance of the evidence, that defendant was aware that AYB was in possession of the boat before AYB sold it to plaintiff. As noted above, ORS 72.4030(3) provides, "Any entrusting of possession of goods to a merchant who deals in goods of that kind gives the merchant power to transfer all rights of the entruster to a buyer in ordinary course of business." If defendant was not aware that AYB had possession of the boat before plaintiff took possession of it, AYB did not have power to transfer defendant's rights in the boat to plaintiff, and the transfer to plaintiff was thus ineffective. Therefore, we must determine (1) whether defendant was ever aware that AYB had possession of the boat and, (2) if so, whether that awareness preceded AYB's transfer of possession to plaintiff on August 29, 2006.[4]

We infer from the evidence in the record that defendant knew that AYB had taken possession of her boat and

_____

[4] As noted above, the trial court found that defendant did not know that AYB could deliver the boat to a buyer without her approval. That is not a relevant fact under ORS 72.4030(3).

listed it for sale and, furthermore, that she became aware of those facts before AYB sold the boat to plaintiff. We draw those inferences largely from defendant's e-mail to Rials stating that she "had faxed a copy of the title some time ago" and asking Rials to "confirm that all fees for moorage and any other incidentals are waived."

■ Defendant's statement that she had faxed a copy of the title shows that she knew that the boat had been listed for sale and that she agreed to continue the listing. We can conceive of no other explanation for defendant sending a copy of the title to a boat broker.[5] Furthermore, defendant's statement that she had faxed a copy of the title "some time ago" indicates that she had agreed to the listing well before sending the e-mail to Rials.

Defendant's statement asking Rials to confirm that fees would be waived shows that defendant knew that AYB had possession of the boat. Again, we can conceive of no explanation for her concern that AYB would charge her moorage fees if she did not know that the boat had been moved to one of AYB's slips. Defendant's explanation at trial—that she knew that Kauffman had moved the boat and that she "just didn't know what kind of charges or costs might have been incurred"—is, in our view, implausible if she merely thought that Kauffman had moved the boat to a slip that AYB did not control. There would be no reason for her to think AYB would charge moorage fees if the boat was not moored in one of its slips. Accordingly, we infer that defendant knew that the boat had been moved to one of AYB's slips and, thus, knew that AYB had possession of it.[6]

---

[5] It may be that defendant was mistaken in asserting that she had faxed a copy of the title to AYB, but that possibility is of no moment. Defendant's e-mail shows that, at the very least, she had *intended* to fax a copy of the title, which supports the same inferences—that she knew that the boat was for sale and that she agreed to continue the listing.

[6] Defendant notes that the trial court expressly found that her testimony was credible. Pointing out her testimony that she did not believe that she had transferred possession of the boat to AYB, she asserts that it is our practice on *de novo* review to defer to the trial court's credibility findings.

Although we ordinarily defer to a trial court's credibility findings on *de novo* review, we are not bound by such findings. We explained our treatment of credibility findings in *State ex rel Juv. Dept. v. G. P.*, 131 Or App 313, 319, 884 P2d 885 (1994):

Defendant's statement about moorage fees does not by itself say anything about *when* defendant learned that AYB had possession of the boat—more specifically, about whether her knowledge that the boat was moored in AYB's slips preceded AYB's sale of the boat to plaintiff. However, in light of our finding that defendant had discovered "some time ago" that AYB had listed the boat for sale, we infer that she also knew "some time ago" that AYB had possession of the boat: We find it highly unlikely that, upon discovering that the boat had been listed for sale, defendant—a 32-year veteran of the title industry and, thus, presumably no stranger to sales agreements—would have decided to allow AYB to continue listing the boat and faxed a copy of the title to AYB without learning the terms of the sale. Those terms included that AYB would be in possession of the boat while it was being offered for sale.

Thus, we find that defendant learned "some time" before plaintiff purchased the boat that AYB had possession of it. Defendant's implicit agreement to allow AYB to continue to list the boat for sale demonstrated acquiescence in AYB's retention of possession of the boat. It follows that, under ORS 72.4030(3), AYB had the power to transfer defendant's rights in the boat to plaintiff. Plaintiff is entitled to a judgment declaring that defendant has no right to continue in possession of the boat and ordering defendant to return

---

"We give deference to the trial court's credibility findings. The degree of deference we give varies with the importance of the trial court's opportunity to observe the witnesses and our ability to discern the trial court's specific credibility determination. * * * [T]he trial court's opportunity to observe the demeanor of the [witnesses] is important. However, demeanor is not the only measure of credibility; internal consistency, logic, and corroboration also guide us. To the extent that a credibility determination is based on a comparison of the witness' testimony with the substance of other evidence, this court is as well equipped as the trial court to make that credibility determination."

(Citations omitted.) *See also id.* at 326 (Deits, P. J., dissenting) ("[R]egardless of how well a witness may comport himself or herself while testifying, we may conclude that other factors, such as the inherent improbability of the testimony, * * * are so persuasive as to render the trial court's findings untenable. In such cases, the weight we accord the trial court is appreciably diminished."). In this case, defendant's testimony that she did not believe that she had transferred possession of the boat to AYB simply cannot be squared with her e-mail to Rials. In our view, the implications of defendant's statements in the e-mail are more persuasive than her testimony. Accordingly, we decline to defer to the trial court's credibility findings.

immediate possession of it to plaintiff and to transfer the title to him.

That conclusion does not end our inquiry. Plaintiff asserts that the trial court erred in failing to address his claim for incidental damages. In his complaint, plaintiff alleged that he is entitled to damages in the amount of the difference between the purchase price and the reasonable value of the boat "in its present condition * * *." At trial, plaintiff testified that he had been permitted to inspect the boat after initiating the action and that it had a "big scrape" on one side and that the interior was "an absolute pigsty." He estimated that the boat needed $4,000 or $5,000 worth of "clean-up" to restore it to the condition it was in when he had it. He also testified that he had paid moorage fees for the boat for seven months after defendant took it and that, at the time of trial, he was still making monthly loan payments and paying insurance premiums on the boat.

On appeal, plaintiff contends that his damages are continuing and that we must remand to the trial court for further proceedings to determine the amount of the damages. Defendant does not contest that the damages are continuing or that a remand is necessary under the circumstances. We agree that it is appropriate for the trial court to consider the damages issue in the first instance. Accordingly, we remand for further proceedings on that issue.

Reversed and remanded.